1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8  NORTHWEST ENVIRONMENTAL
   ADVOCATES, et al.,                        No. C 03-05760 SI

9                                            **ORDER GRANTING PLAINTIFFS'**
              Plaintiffs,                     **MOTION FOR PERMANENT**
10                                            **INJUNCTIVE RELIEF**

11  THE STATES OF NEW YORK, ILLINOIS,
    MICHIGAN, MINNESOTA, WISCONSIN
12  AND THE COMMONWEALTH OF
    PENNSYLVANIA,

13            Plaintiff-Intervenors,

14     v.

15  UNITED STATES ENVIRONMENTAL
    PROTECTION AGENCY,
16
              Defendant,
17
    SHIPPING INDUSTRY BALLAST WATER
18  COALITION,

19            Defendant - Intervenor.

20  _____ /

21
22        Plaintiffs have moved for a permanent injunction in this case.  Having considered the parties'

23  argument, and for good cause appearing, the Court GRANTS plaintiffs' motion and REMANDS this

24  case to EPA for further proceedings.  The Court will vacate the regulation at 40 C.F.R. § 122.3(a)[1] on

    September 30, 2008.
25

26  _____

27        [1]Plaintiffs have indicated that they challenge only the vessel-discharge exemption contained in
    40 C.F.R. § 122.3(a) and do not intend to disturb the remainder of the regulation.  Accordingly, the
    Court will limit its remedy to those portions of the regulation that exempt vessel discharges from
28  regulation under the National Pollution Discharge Elimination System.

**BACKGROUND**

Plaintiffs in this action challenge a regulation originally promulgated under the Clean Water Act ("CWA") more than 30 years ago.  The regulation at issue, 40 C.F.R. § 122.3(a), exempts effluent discharges "incidental to the normal operation of a vessel" from regulation under the National Pollution Discharge Elimination System ("NPDES").[2]  In 2003, plaintiffs filed suit in this Court, seeking to have the regulation declared *ultra vires* to the CWA.  The Court agreed, and, on March 31, 2005, granted summary judgment in plaintiffs' favor.

The question now before the Court is what remedy is most appropriate to address the *ultra vires* regulation.  This is a complicated question, primarily because the regulation at issue has stood unchallenged since 1973.  In addition to the regulation's longstanding history, the question is complicated by EPA's protestations that it will be unable to address the issue effectively in a timely fashion, as well as by the dramatic effect this Court's ruling may have on the shipping industry and the agencies that issue NPDES permits.  The Court must weigh these factors against the CWA's overarching goal: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Because of the complicated nature of the question before it, the Court will provide the background of this case in some detail.

1.      **The Clean Water Act and the National Pollution Discharge Elimination System**

In 1972, Congress enacted significant amendments to the Clean Water Act ("CWA") in order

---

[2]The challenged regulation provides:

The following discharges do not require NPDES permits:

(a) Any discharge of sewage from vessels, effluent from properly functioning marine engines, laundry, shower, and galley sink wastes, or any other discharge incidental to the normal operation of a vessel.  This exclusion does not apply to rubbish, trash, garbage, or other such materials discharged overboard; nor to other discharges when the vessel is operating in a capacity other than as a means of transportation such as when used as an energy or mining facility, a storage facility or a seafood processing facility, or when secured to the bed of the ocean, contiguous zone or waters of the United States for the purpose of mineral or oil exploration or development.

40 C.F.R. § 122.3(a).  Plaintiffs challenge only the first sentence of the regulation; they do not seek to affect EPA's prohibition on discharges of "rubbish, trash, garbage, or other such materials" or of discharges from vessels that are "operating in a capacity other than as a means of transportation."

United States District Court

For the Northern District of California

"to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33

U.S.C. § 1251(a).  "To achieve these desirable goals, the Act 'establishes a comprehensive statutory

system for controlling water pollution.  To that end, it establishes the . . . NPDES permit system for

regulating discharges of pollutants into the waters of the United States.'" *Ass'n to Protect Hammersly,*

*Eld, and Totten Inlets v. Taylor*, 299 F.3d 1007, 1009 (9th Cir. 2002) (quoting *Nat'l Wildlife Fed'n v.*

*Consumer Power Co.*, 862 F.2d 580, 582 (6th Cir. 1988)).  An NPDES permit "allows a polluter . . . to

discharge a specified amount of a pollutant" into the navigable waterways of the United States.

*Fairhurst v. Hagener*, 422 F.3d 1146, 1148 (9th Cir. 2005) (internal quotation marks omitted).  "[T]he

discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal." *Waterkeepers*

*Northern Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 915 (9th Cir. 2004).

The Ninth Circuit has recently described the NPDES as follows:

> The [CWA] offers two approaches for controlling water pollution: technology-based regulations and water quality standards.  Technology-based regulations reduce levels of pollution by requiring a discharger to make equipment or process changes, without reference to the effect on the receiving water.  Water quality standards set the permissible level of pollution in a specific body of water without direct regulation of the individual sources of pollution.
>
> The [NPDES] permit program governs implementation of both technology-based requirements and water quality standards.  33 U.S.C. §§ 1311(b)(1)(C), 1342(a)(1); 40 C.F.R. § 122.44(a), (d)(1).  An NPDES permit sets specific limits that apply to individual polluters.  Discharges from any "point source" into the waters of the United States are prohibited unless the discharge complies with the limits and requirements of the NPDES permit.  33 U.S.C. § 1311(a), 1362(12), (14).

*City of Arcadia v. U.S. Envt'l Protection Agency*, 411 F.3d 1103, 1105 (9th Cir. 2005).

NPDES permits may not last longer than five years. 33 U.S.C. § 1342(a)(3), (b)(1)(B). Permits

may be issued either to individual entities or as "general permits" that cover many dischargers.  *See*

*Waterkeepers*, 375 F.3d at 915.  Individual permits are issued on a case-by-case basis, taking into

account local environmental conditions. *Fairhurst*, 422 F.3d at 1148.  "General permits, on the other

hand, are issued for an entire class of hypothetical dischargers in a given geographical region and are

issued pursuant to administrative rulemaking procedures." *Nat. Res. Def. Council v. U.S. Envt'l*

*Protection Agency*, 279 F.3d 1180, 1183 (9th Cir. 2002) (internal citations omitted).  General permits

operate as follows:

After a general permit has been issued, an entity that believes it is covered by the general

United States District Court

For the Northern District of California

permit submits a "notice of intent" to discharge pursuant to the general permit. A general permit can allow discharging to commence upon receipt of the notice of intent, after a waiting period, or after the permit issuer sends out a response agreeing that the discharger is covered by the general permit. Whichever of these three authorization methods is used in the general permit, the permit issuer can require a particular discharger to undergo the individual permit application process.

*Id.* (internal citations omitted).

Although primary responsibility for enforcing the CWA lies with EPA, "Congress has given 'the Governor of each State desiring to administer its own permit program' permission to do so, provided that the EPA Administrator approves the Governor's program." *Fairhurst*, 422 F.3d at 1148 (citing 33 U.S.C. § 1342(b)). EPA must approve state permit programs if they meet certain criteria. *Defenders of Wildlife v. U.S. Envt'l Protection Agency*, 420 F.3d 946, 950 (9th Cir. 2005). "When a state program is in force, the federal permit program is suspended." *Fairhurst*, 422 F.3d at 1148. Under this "cooperative federalism" scheme, EPA establishes the minimum requirements that must apply to all entities regulated under the CWA, and states may adopt more stringent standards where they see fit. 33 U.S.C. § 1342(b); 40 C.F.R. § 123.1.

**2.      Pollution from Vessel Discharges**

The challenged regulation exempts discharges "incidental the normal operation of a vessel." 40 C.F.R. § 122.3(a). Although this includes such discharges as gray water, bilge water, deck runoff, and blackwater,[3] plaintiffs make no secret that the type of discharge they are primarily concerned with is ballast water.

Ballast water is water that is taken on by cargo ships to compensate for changes in the ship's weight as cargo is loaded or unloaded, and as fuel and supplies are consumed. Ballast water may be used for a number of different purposes, such as maintaining stability, maintaining proper propeller and bow immersion, and to compensate for off-center weights. *See* Decl. of Kathleen Moore ("Moore Decl."), ¶ 4. Thus, ballast water is essential to the proper functioning of cargo ships, as well as to the safety of its crew.

---

[3] Grey water is water that has been slightly used, such as water from laundry or bathing. Bilge water is water that has collected on the inside of a vessel and is pumped out. Black water is sewage.

United States District Court

For the Northern District of California

Because ballast water is primarily used to compensate for changes in cargo, it is generally taken in or pumped out at the ports along a ship's route. Decl. of Richard A. Everett ("Everett Decl."), at ¶ 4. When a ship takes on ballast water, whether freshwater or saltwater, organisms found in that water are typically taken in as well. *Id.* These organisms are carried in the ballast tanks of the ship until the ship arrives at its next port, where, due to changes in the distribution of the ship's cargo, they may be released into a new ecosystem. Due to the size of ballast tanks on modern cargo ships, and the speed with which these ships can reach their destinations, organisms are increasingly able to survive the journey to a new ecosystem. All told, "more than 10,000 marine species each day hitch rides around the globe in the ballast water of cargo ships." Decl. of Deborah A. Sivas in Support of Pl. Mot. for Summary Judgment ("Sivas Decl."), Exh. C, at 4. A number of these species are released into U.S. waters in the more than 21 billion gallons of ballast water released in the United States each year. *Id.*

If these foreign organisms manage to survive and reproduce in the new ecosystem, they can cause severe problems in the natural and human environment. For example, zebra mussels, native to the Caspian Sea region of Asia, were brought into the Great Lakes in the ballast water of cargo ships. "Zebra mussels have clogged the water pipes of electric companies and other industries; infestations in the Midwest and Northeast have cost power plants and industrial facilities almost $70 million between 1989 and 1995." Sivas Decl., Exh. E, at 4. As another example, according to a 2001 EPA report,

> [a]n introduced strain of cholera bacteria, possibly released in the bilge water of a Chinese freighter, caused the deaths of 10,000 people in Latin America in 1991. This cholera strain was then imported into the United States from Latin America in the ballast tanks of ships that anchored in the port of Mobile, Alabama. Fortunately, cholera bacteria were detected in oyster and finfish samples in Mobile Bay . . . and no additional deaths occurred from exposure to this pathogen.

Sivas Decl., Exh. A., at 47.

With a lack of natural predators, invasive species can multiply rapidly and quickly take over an ecosystem, threatening native species. Sivas Decl., Exh. H, at 3, ("Invasive species have also had a devastating effect on natural areas, where they have strangled native flora, taken over wetland habitats, and deprived waterfowl and other species of food source."). Indeed, invasive species "are a major or contributing cause of declines for almost half the endangered species in the United States." *Id.* at 10. Once established, invasive species become almost impossible to remove, leading "[s]cientists, industry

officials, and land managers [to] recogniz[e] that invasive species are one of the most serious, yet least appreciated, environmental threats of the 21st century." *Id.* at 7.

In economic terms, invasive species can also have a devastating effect. *See* Sivas Decl., Exh. C, at 9 ("A recent report estimated that over $5 billion per year in economic damage are caused by [Aquatic Nuisance Species ("ANS")].").  The Department of Agriculture spends millions of dollars per year to detect and prevent invasive species.  Sivas Decl., Exh. H, at 4 ("In fiscal years 2000, USDA spent about $556 million on a wide range of invasive-species related activities.").  One study cited by the GAO concluded that "total annual economic losses and associated control costs [are] about $137 billion a year – more than double the annual economic damage caused by all natural disasters in the United States." *Id.* at 8.

### 3.   Other Regulations Protecting Against Introduction of Invasive Species

Despite the fact that EPA has exempted vessel discharges from the NPDES for the past 30 years, the problem of invasive species in ballast water has not gone unaddressed.  In 1990, Congress passed the Non-Indigenous Aquatic Nuisance Prevention and Control Act ("NANPCA"), Pub. L. No. 101-646, 104 Stat. 4761 (1990), *codified at* 16 U.S.C. §§ 4701-4751.  Congress later amended NANPCA with the National Invasive Species Act of 1996 ("NISA"), Pub. L. No. 104-332, 110 Stat. 4073 (1996).  Together, these statutes seek to regulate the problem of invasive species in ballast water.  The Coast Guard promulgates regulations under both acts.

The Coast Guard's regulations are codified at 33 C.F.R. Part 151, Subparts C and D.  Under these regulations, any vessel equipped with ballast water tanks must file a report with the Coast Guard 24 hours prior to arrival at a United States port.  33 C.F.R. § 151.2041.  All vessels equipped with ballast water tanks must also have a ballast water management plan.  33 C.F.R. § 151.2035(7).  These regulations, voluntary at first, were made mandatory in September 2004. *See Mandatory Ballast Water Management Program for U.S. Waters*, 69 Fed. Reg. 44,952, 44,961 (July 28, 2004).

In addition to the above, Coast Guard regulations require that all vessels equipped with ballast

6

United States District Court

For the Northern District of California

water tanks entering U.S. waters from beyond the "exclusive economic zone"[4] must use one of three practices designed to reduce the amount of invasive species in their ballast water. These vessels must: (1) perform a complete ballast water exchange[5] 200 nautical miles or more from shore; (2) retain ballast water on board the vessel; or (3) use an environmentally sound method of ballast water management that has been approved by the Coast Guard. *Id.*

Recently, the Coast Guard has promulgated regulations that placed stronger restrictions on vessels that enter the Great Lakes with no ballast water on board, known as "NOBOB" vessels. Ballast tanks in such vessels often contain residual ballast water that may contain invasive species. This latest regulation asks vessels entering the Great Lakes to either conduct open-ocean exchange or flush their ballast tanks with salt water, in order to kill any invasive freshwater species that may exist in the residual ballast water. *Ballast Water Management for Vessels Entering the Great Lakes that Declare No Ballast Onboard*, 70 Fed. Reg. 51,831, 51,835 (Aug. 31, 2005). The regulation, however, has not been made mandatory.

There have also been international efforts to manage ballast water discharges. The International Maritime Organization has addressed the problem through the International Convention for the Control and Management of Ships' Ballast Water and Sediments, Feb 13, 2004, IMO 1620M, RMC 1.7.250 ("Convention"). The Convention includes requirements:

> (1) for a ballast water management plan (approved by the vessel's flag nation) and a vessel ballast water record book, to be maintained on-board and used to document each ballast water operation; (2) that ships perform ballast water exchange with an efficiency of at least 95% volumetric exchange (for ships that use the "pump through" method, pumping through three times the volume of each ballast tank will be considered equivalent to meeting the 95% standard); (3) for phased implementation, on a schedule of fixed dates, of a concentration-based performance standard that prescribes the maximum number of viable organisms per unit volume of ballast water, as well as a

---

[4]The exclusive economic zone extends 200 nautical miles seaward from the territorial coast. *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1058 n.1 (9th Cir. 2005).

[5]Under the regulations, ballast water exchange may be conducted in one of two ways. First, "[t]he tank (or pair of tanks) is pumped down to the point where the pumps lose suction, and then the tank is pumped back up to the original level." 69 Fed. Reg. at 44,953. Second, "mid-ocean water is pumped into a full tank while the existing coastal or fresh water is pumped through or pushed out through another opening. . . . [A] volume of water equal to three times the ballast tank capacity must be pumped for a flow-through exchange." *Id.* Due to the "physical, chemical, and biological conditions" of water in the open ocean, "[o]rganisms contained in ballast water that is exchanged in mid-ocean will not, or are unlikely to survive in an open ocean system." *Id.*

1    maximum number of colony forming units per unit of volume for indicator microbes.

2    Moore Decl., ¶ 16.

3        The Convention, however, has not yet been ratified, and estimates are that it will not be for

4    another several years.  Even then, the treaty will not enter into force until twelve months after it is

5    ratified.  Further, the Convention includes a phase-in provision that does not require new vessels to meet

6    performance standards until 2009, and existing vessels need not meet the standards until 2014.  Shipping

7    Coalition Br., at 19.

8

9    **4.    Procedural History**

10       In January 1999, plaintiffs filed an administrative petition requesting that the EPA repeal 40

11   C.F.R. § 122.3(a) because it conflicts with the Clean Water Act, which does not exempt "discharges

12   incidental to the normal operation of a vessel" from the requirement that a polluter obtain an NPDES

13   permit.  Sivas Decl., Ex. J ("Petition to Repeal 40 C.F.R. § 122.3(a)"), at 1-2.  After considering public

14   comments, the EPA denied the petition to repeal the exemption.  68 Fed. Reg. 53,165 (September 9,

15   2003); *see also* Decision on Petition for Rulemaking to Repeal 40 C.F.R. 122.3(a) ("EPA Response"),

16   *available at* http://www.epa.gov/npdes/pubs/ballast_report_petition_response.pdf.

17       After the denial of their administrative petition, plaintiffs filed a complaint in this Court against

18   EPA, requesting a declaration that EPA's failure to rescind 40 C.F.R. § 122.3(a) in response to

19   plaintiffs' petition was in clear violation of the CWA, and an injunction directing the EPA to repeal and

20   rescind the regulation.  Plaintiffs asserted two claims:  1) that EPA's promulgation of 40 C.F.R.

21   § 122.3(a) was inconsistent with the its statutory authority in the CWA and thus was unlawful and

22   subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); and 2) that

23   EPA's denial of plaintiffs' petition was arbitrary, capricious, and an abuse of discretion.

24       In an order filed March 31, 2005, the Court granted plaintiffs' motion for summary judgment.

25   In its summary judgment order, the Court first addressed EPA's argument that plaintiffs' challenge to

26   the regulation was barred by the six-year statute of limitations that applies to actions against the United

27   States.  *See* 28 U.S.C. § 2401(a).  The Court rejected this argument, finding that the six-year statute of

28   limitations did not apply because plaintiffs claimed the regulation was *ultra vires* to the CWA.  *See*

United States District Court

For the Northern District of California

8

*Wind River Mining Corp. v. United States*, 946 F.2d 710 (9th Cir. 1991) (holding that a challenge to a regulations on the grounds that it exceeded the agency's statutory authority could be brought more than six years after the regulation was promulgated).  As to the merits, the Court found that Congress had directly expressed its intention that discharges from vessels be regulated under the CWA, and that the regulation at issue contradicted that intention.  The Court further found that Congress's inaction over the past 30 years could not be interpreted as congressional acquiescence.  Thus, the Court held that the regulation was *ultra vires* to the CWA.

Given the national significance of the issues and the potential for confusion inherent in vacating a longstanding EPA regulation, at a subsequent case management conference the Court invited briefing on the proper selection of remedy going forward.  Because the parties' positions are fairly divergent, the Court will set them out here:

- Private plaintiffs[6] propose that the Court issue a two-tiered remedy.  They suggest that the Court give EPA 90 days to decide whether it will implement regulations governing discharges incidental to the normal operation of a vessel.  If EPA decides not to implement new regulations, plaintiffs proposed that the Court set aside 40 C.F.R. § 122.3(a) 180 days later (270 days after the date of the Court's order).  If, at the end of the 90 day period, EPA informs the Court that it intends to implement new regulations, plaintiffs propose that the Court provide EPA 180 more days to publish proposed regulations, and an additional 270 days to finalize the regulations.  Thus, under this second alternative, the Court would vacate the existing regulation 540 days after its order.

- State plaintiff-intervenors[7] propose that the Court require EPA to establish interim regulations by April 1, 2006, and final regulations by October 1, 2007.

- EPA asserts that the only proper remedy is for the Court to set aside EPA's denial of plaintiffs' administrative petition and to remand the administrative petition to the agency for further proceedings.  EPA strongly denies that the Court has the ability to address the challenged regulation.  EPA also requests that the Court limit its summary judgment order to ballast water discharges.

- Like EPA, defendant-intervenor[8] the Shipping Industry Ballast Water Coalition ("Shipping Coalition") requests that the Court limit its summary judgment order to ballast water discharges.  The Shipping Coalition also requests that the Court leave the

---

[6]These plaintiffs include Northwest Environmental Advocates, the Ocean Conservancy, and Waterkeepers Northern California.

[7]By order filed May 27, 2005, New York, Illinois, Michigan, Minnesota, Wisconsin, and Pennsylvania were allowed to intervene in this action.

[8]By order filed June 22, 2005, the Shipping Coalition was permitted to intervene.

United States District Court

For the Northern District of California

existing regulation intact and remand to EPA to develop new regulations on its own timetable. Alternatively, the Shipping Coalition argues that the Court should impose on EPA the same timetable as is contemplated in the IMO treaty. The Coalition also argues that the Court should stay the remedy it imposes pending review of its summary judgment order.

## LEGAL STANDARD

Typically, when an agency violates the Administrative Procedure Act, the appropriate response is to "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Defenders of Wildlife*, 420 F.3d at 978. "In certain instances, however, 'when equity demands, the [challenged action] can be left in place while the agency follows the necessary procedures.'" *Id.* (quoting *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)) (alteration in original).

District courts possess "broad discretionary power" to fashion equitable relief, *see Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973), and they are able to use that power to enforce prompt compliance with a court order by an administrative agency. *See Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 823, 834-35 (9th Cir. 2002) (affirming district court's injunction requiring agency to undertake an environmental review of sixty-eight permits on an expedited schedule); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 n.6 (9th Cir. 2004) (upholding injunction that required Forest Service to "complete the NEPA process analyzing the cumulative impacts of pack stock operations no later than December 31, 2005"). This power is not diminished when a district court considers equitable relief under the CWA. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-20 (1978); *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994) (affirming district court's exercise of remedial powers because "[t]he district court has broad discretion in fashioning equitable relief when necessary to remedy an established wrong").

"The requirements for the issuance of a permanent injunction are (1) the likelihood of substantial and immediate irreparable injury; and (2) the inadequacy of remedies at law." *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1010 (9th Cir. 2004). "In issuing an injunction, the Court must balance the equities between the parties and give due regard to the public interest." *High Sierra Hikers*, 390 F.3d at 642. "Environmental injury, by its nature, can seldom be adequately remedied by money damages

10

and is often permanent or at least of long duration, i.e., irreparable." *Id.* (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S. Ct. 1396 (1987).

**DISCUSSION**

**1.     Limitation of Remedy to Ballast Water Discharges**

Both EPA and Shipping Coalition contend that the Court's remedy should apply only to ballast water, and not to other discharges from vessels, such as gray water, bilge water, or blackwater.  The Court, however, finds that its remedy should apply to all discharges from vessels, not just ballast water.[9]

**A.     Scope of Agency Action**

EPA first argues that the Court lacks jurisdiction to address vessel discharges other than ballast water because the scope of the agency action at issue was limited to ballast water.  *See E.P. Paup Co. v. Director, Office of Workers' Compensation Programs*, 999 F.2d 1341, 1348 n.2 (9th Cir. 1993) (citing general rule that "absent exceptional circumstances, a reviewing court will not consider contentions not raised before the administrative agency at the appropriate time"); *Marathon Oil Co. v. United States*, 807 F.2d 759, 767-68 (9th Cir. 1986).  EPA claims that plaintiffs' administrative petition was based only on ballast water discharges, and that its response to the petition was therefore limited to ballast water. Because it has not yet considered other vessel discharges, EPA argues, the Court lacks jurisdiction to address types of vessel discharges other than ballast water.

In support of this argument, EPA points to numerous passages from plaintiffs' submissions to EPA, this Court, and the Ninth Circuit, all of which focus on the effects of ballast water discharges, rather than the effects of other vessel discharges.  *See* EPA Br. at 5-6.  EPA argues that all of these passages demonstrate that plaintiffs focused on ballast water, and not other vessel discharges.

While the Court agrees that ballast water was the primary focus of plaintiffs' complaint, the

---

[9]Of course, the Court places no limitation on the manner in which EPA addresses the different vessel discharges.  EPA is free to fashion different regulatory requirements for the different types of discharges at issue.

United States District Court

For the Northern District of California

Court does not believe that plaintiffs' challenge was as limited as EPA contends.  Plaintiffs have consistently made clear that their overall aim is the repeal of the exemptions contained in 40 C.F.R. § 122.3(a).  For example, plaintiffs' petition was titled "petition for repeal of 40 C.F.R. § 122.3(a)." Sivas Decl., Exh. J.  EPA's response to plaintiffs' petition is similarly titled: "Decision on Petition for Rulemaking to Repeal 40 C.F.R. 122.3(a)."  Moreover, EPA's response recognized that plaintiffs sought repeal of the entire regulation.  *See* EPA Response at 1 ("On January 13, 1999, the Pacific Environmental Advocacy Center submitted the petition . . . seeking the repeal of a regulation . . . published at 40 C.F.R. § 122.3(a).").  Similarly, plaintiffs' complaint in this Court requested the repeal of 40 C.F.R. § 122.3(a) in its entirety.  *See, e.g.*, Compl. at ¶ 1 ("This is an action for declaratory and injunctive relief challenging the legality of 40 C.F.R. § 122.3(a), which exempts vessel discharges from the [NPDES] permit requirements . . . ."); *see also* Compl. at ¶ 18 ("Such vessel discharges include, among other things, ballast water, bilge water, cooling water, deck runoff, graywater, and oil or oily water.").  Plaintiffs' summary judgment brief was likewise not limited to ballast water.  *See* Pl. Br. in Support of Mot. for Summary Judgment, at 2-3 (pollution sources include, "gray water, bilgewater, blackwater (sewage), ballast water, anti-fouling paints (and their leachate), hazardous materials, and municipal and commercial garbage and other wastes"), 10 ("Beyond these two classes of express exemptions, any other discharge of a pollutant from a vessel or other floating craft into the territorial seas or other navigable waters of the United States can only occur pursuant to an NPDES permit.").  Although plaintiffs' arguments focus on ballast water, given that the regulation deals with vessel discharges in a blanket manner, it is understandable that plaintiffs would treat vessel discharges in a similar fashion.

Plaintiffs sought from the beginning to invalidate the entire regulation at issue.  EPA may not now seek to narrow the claims that plaintiffs legitimately presented.  The Court therefore DENIES EPA's request to limit its remedy to ballast water discharges.

### B.    Standing

Both EPA and the Shipping Coalition argue that plaintiffs lack standing to challenge all effluent discharges that are "incidental to the normal operation of a vessel" because plaintiffs have alleged injury

12

only with respect to ballast water discharges. EPA Br. at 7; Shipping Coalition Br. at 31-32. In response, plaintiffs have produced a declaration from one of their members, describing his concerns with vessel discharges other than ballast water. Decl. of Mark Riskedahl in Support of Pl. Reply Br. ("Riskedahl Decl."). In the declaration, Riskedahl states that he frequently uses the Columbia River for recreation and aesthetic enjoyment, and that he has altered his behavior based upon his concerns about pollution in the waterway. The Court finds that the declaration is sufficient to give plaintiffs standing. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (holding that concern over the environmental effects of pollution is sufficient injury to confer standing); *Colorado Envt'l Coalition v. Bureau of Land Mgmt.*, 932 F. Supp. 1247, 1250 (D. Colo. 1996) (considering supplemental affidavits and declarations on standing issue); *Humane Soc. of U.S. v. Babbitt*, 849 F. Supp. 814 (D.D.C. 1994) (same).

### C.    *De Minimis* Sources of Pollution

Finally, both EPA and the Shipping Coalition argue that the exemption for vessel discharges other than ballast water should remain in place because the other discharges are "*de minimis* sources of pollution." EPA Br. at 9-10; Shipping Coalition Br. at 33. The Ninth Circuit has previously found that "the EPA . . . is permitted . . . to exempt *de minimis* sources of [pollution] from pollution controls." *Ober v. Whitman*, 243 F.3d 1190, 1195 (9th Cir. 2001). Defendants argue that EPA should likewise be able to exempt trivial sources of pollution from the NPDES permit system.

This argument is untimely. EPA had the opportunity to present this argument at the summary judgment phase, when it briefed the Court on whether the regulation at issue complied with the CWA. Having lost on summary judgment, EPA may not now return to the Court in an eleventh-hour effort to limit the scope of the Court's adverse ruling. Indeed, at this point the Court has no way of evaluating EPA's argument – other than EPA's contentions, there has been no briefing the quantitative environmental effect of vessel discharges other than ballast water. Nor is it clear that such evidence would be appropriate, given that the Court is not reviewing the rationale for EPA's decision, but rather the mandates of the CWA.

Even assuming that *de minimis* sources of pollution can be exempted from the NPDES permit

13

system, the Court finds it undesirable to cross that bridge at this juncture.  Rather, EPA may consider whether any vessel discharges produce only *de minimis* pollution on remand from this Court.  *Cf. Fed. Power Comm'n v. Idaho Power Comm'n*, 73 S. Ct. 85, 86-87 (1952) (appellate court "usurped an administrative function" by dictating how agency should respond to its ruling).

### 2.     Limitation of Remedy to EPA's Denial of Plaintiffs' Petition

EPA's next argument is that this Court's remedy should be limited to the final agency action that gave rise to judicial review – EPA's denial of plaintiffs' administrative petition. EPA Br. at 10-11.  But as this Court made clear in its summary judgment order, plaintiffs properly brought an *ultra vires* challenge to the regulation at issue.  *See* Order Granting Plaintiffs' Motion for Summary Judgment; Denying Defendant's Motion for Summary Judgment, dated March 31, 2005 ("Summary Judgment Order"), at 11.  Thus, this Court has jurisdiction not only over the denial of plaintiffs' petition, but also over the challenged regulation.  *See Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152-53 (D.C. Cir. 1990) ("[A] claim that agency action was violative of statute may be raised outside a statutory limitations period, by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition."); *Legal Environmental Assistance Found, Inc. v. U.S. Envt'l Protection Agency*, 118 F.3d 1467, 1473 (11th Cir. 1997) ("[I]n the course of reviewing EPA's order denying LEAF's petition, over which our jurisdiction is not questioned, we also have jurisdiction to entertain LEAF's contention that the regulations upon which EPA relies are contrary to statute and therefore invalid . . . .").  Thus, the Court finds that it has the ability to set aside the regulation at issue for being *ultra vires* to the CWA.

### 3.     Injunctive Relief

In considering which of the parties' positions most closely approximates the proper remedy in this case, the Court is primarily guided by one factor: the EPA regulation is plainly contrary to the congressional intent embodied in the CWA.  For this reason, the Court believes that it is appropriate to set aside the regulation at issue, and that the proposed remedies of the EPA and the Shipping Coalition, both of which would leave the regulation in place indefinitely, are inadequate.

14

United States District Court

For the Northern District of California

1    Nevertheless, the Court is influenced by the fact that the regulation at issue has stood for the past

2    30 years, and by the fact that the effects of an immediate vacatur would be so dramatic as to make such

3    an option a practical impossibility.  Indeed, not even plaintiffs request an immediate vacatur of the

4    challenged regulation.  While the practical implications of the Court's order make the Court wary of

5    imposing a deadline on EPA that is too ambitious, the potential harm that ballast waters represent to our

6    nation's ecosystems leads the Court to conclude that there is an urgency to promulgating new

7    regulations that EPA has not, to this point in the litigation, acknowledged.  Thus, the Court must decide

8    upon a time frame for vacating the regulation that balances the need for prompt action against the need

9    to allow EPA adequate freedom to address a complicated issue.

10    The most substantial question confronting the Court is whether to issue injunctive relief ordering

11    EPA to act in accordance with the Court's order by a certain date.  In light of the arguments the parties

12    have presented, the Court finds that the preferable route is to give the agency a certain date on which

13    the regulation will be vacated, and to allow the agency freedom to work around that date to find an

14    appropriate solution to the problem of vessel discharges.  Indeed, in considering the variety of technical

15    arguments the parties have presented about the appropriate remedy, the Court has been reminded that

16    EPA holds an expertise in this area that the Court cannot approach.[10]  Thus, the Court believes that EPA

17    should be given wide latitude, within broad constraints, to address the problem of discharges from

18    vessels.  Accordingly, the Court rules as follows: the Court will GRANT plaintiffs' motion for a

19    permanent injunction, and will set aside the challenged regulation as of September 30, 2008.[11]  Absent

20    a compelling justification, the Court will not act further to supervise how EPA responds to this order.

21

22

23    [10]As one example, the parties have submitted declarations describing the feasibility of using existing wastewater treatment technologies for treating vessel discharges. Plaintiffs' declarant, Andrew N. Cohen, describes the possibility of using vessel- or land-based treatment facilities to treat ballast

24    water and other vessel discharges.  EPA' declarant, Commander Kathleen Moore, discusses the difficulties associated with such technologies.  Obviously, the Court's knowledge of either subject is

25    very limited, especially given the limited briefing the parties have presented on the issue.  EPA possesses the requisite expertise to make such decisions, and it is not this Court's place to dictate what

26    those decisions should be.  The Court's sole concern is that Congress's intent be effectuated in as timely a manner as possible.

27

28    [11]If EPA decides upon final action earlier than September 30, 2008, it may petition this Court to vacate the regulation at an earlier date.

15

United States District Court

For the Northern District of California

**A.     Permanent Injunctive Relief**

The Court finds that permanent injunctive relief is warranted in this situation.  As an initial matter, plaintiffs have established that there is an immediate threat of irreparable injury.  Environmental injury ordinarily constitutes irreparable injury, *High Sierra Hikers*, 390 F.3d at 642, but the environmental injury in this case – introduction of invasive species – is more certainly irreparable than most.  There is no dispute that invasive species have been, and continue to be, introduced into the marine ecosystems of this country through ballast water discharges.  There is also no dispute over the consequences that their introduction can have on the environment.  Once introduced, invasive species can spread rapidly, threaten native species with extinction, and become almost impossible to eradicate. *See, e.g.*, Sivas Decl., Exh. A, C, G, H.  The broad and significant effects that invasive species have on their new environment, combined with the generally impossible task of removal once those species become established, easily satisfies the threshold requirement of irreparable injury.

The Court also believes that other remedies are inadequate to address this injury.  Money damages are plainly insufficient to remedy plaintiffs' injuries. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S. Ct. 1396 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages . . . .").  Although EPA argues that a declaratory judgment would be an adequate remedy, the Court disagrees.  Given the immediate threat posed by invasive species, simple remand to EPA, with no timetable for a replacement regulation, is insufficient to address the problem.  Rather, the Court finds that equitable relief is necessary to ensure that this significant problem is addressed in a prompt fashion.

Nor does the Court believe that existing regulations are adequate to address the threat of invasive species.  EPA claims that the federal government has acted effectively to prevent the introduction of invasive aquatic species through ballast water, citing the Coast Guard regulations and the IMO Convention in support.  But both of these protections are incomplete.  The IMO Convention has not been ratified by the United States, nor has it entered into force.  Thus, EPA's claims that the Convention provides a protective barrier against introduction of invasive species rings completely hollow.  While the Coast Guard regulations provide a starting point in the defense against invasive species, they are not completely effective at addressing the problem.  Pl. Reply Br., Exh. A. ("While we have made

16

1    significant progress domestically under the current legislative framework, there is no question that this

2    framework needs to be upgraded to move us to a greater level of protection.").  Indeed, many of the

3    Coast Guard regulations remain voluntary.  More importantly, the Coast Guard regulations do not

4    relieve EPA of its duty to follow the mandates that Congress has established.[12]

5           Finally, the Court finds that the balance of equities weighs in favor of injunctive relief.  *See, e.g.*,

6    *Amoco*, 480 U.S. at 545 ("[T]he balance of harms usually favors issuance of an injunction to protect the

7    environment.").  For 30 years now, EPA has had a rule in place that is contrary to the intent of Congress,

8    resulting in the release of numerous invasive species into our aquatic ecosystems.  EPA's failure to

9    comply with Congress's intent strongly tips the equities in favor of an injunction.  Although EPA and

10   the shipping industry have argued that an injunction will bring catastrophic results to the global shipping

11   industry, the Court believes that their concerns are dramatically overstated.  Their arguments are based

12   on the assumption that ballast water discharges will be absolutely and immediately prohibited.  Since

13   the Court is giving EPA two years to develop a system, within the constraints of the CWA, that will

14   allow ballast water to be discharged within certain parameters, the Court does not see the same risk of

15   catastrophe.

16          Although the Court recognizes that its two-year time frame is ambitious, it does not believe that

17   it will impose an undue burden on either EPA or the shipping industry.  EPA has now had over six years

18   – since the plaintiffs filed their administrative petition in 1999 – to consider the problem of regulating

19   vessel discharges under the NPDES.  The materials that EPA submitted in this lawsuit indicate that it

20   is intimately familiar with the problem.  Thus, the Court believes two years is an adequate amount of

21   time to allow EPA to take action to correct the *ultra vires* exemption for vessel discharges.  In addition,

22   both the Coast Guard regulations and the IMO Convention demonstrate that ballast water discharges

23   can be regulated in a straightforward manner.  To the extent that future EPA regulations place any

24   burden on the shipping industry, the Court believes that two years is a significant enough amount of time

25   to allow the shipping industry to gradually adjust its practices.

26

27          [12]EPA may be correct in its argument that the Coast Guard would have been the most appropriate
     agency to regulate vessel discharges.  That judgment, however, was for the Congress, not this Court,
28   to make.

Finally, EPA's arguments about the practical difficulties of regulating vessel discharges ignores the numerous tools it has under the CWA. General permits allow it to regulate large numbers of vessels, and a provision of the APA allows it to promulgate rules without opportunity for public comment when an agency finds "good cause" that notice and comment would be impractical. 5 U.S.C. § 553(b)(B). In addition, the CWA adopts a flexible approach to controlling water pollution, allowing EPA to adjust its regulations as new technologies appear and existing technologies are improved. Indeed, the CWA requires that EPA base its pollution limitations on the "best available technology economically achievable." 33 U.S.C. § 1311(b)(2)(A). Moreover, the requirement that NPDES permits last only five years serves to ensure that permits evolve to reflect advances in technology. *See* 33 U.S.C. § 1342(b)(1)(B) (NPDES permits "are for fixed terms not exceeding five years"); 33 U.S.C. § 1342(b)(1)(A) (NPDES permits must apply the "best available technology" requirement of 33 U.S.C. § 1311). Thus, the Court believes that EPA has the tools at its disposal to comply with the September 30, 2008, deadline.

### B.    Appropriateness of September 30, 2008 Deadline

According to the dates submitted by the parties, the Court believes its September 30, 2008, deadline is reasonable. It is not a significant delay over the dates proposed by the plaintiffs and plaintiff-intervenors, who requested final agency action within 18 months of this Court's order and by October 1, 2007, respectively. The Court also believes that two years is sufficient to allow EPA room to address the issue. Further, it is sufficient to provide both the entities who issue NPDES permits and the shipping industry sufficient time to become aware of, and to adjust to, the fact that vessel discharges will be subject to the NPDES.

Plaintiffs argue that this Court should be more active in monitoring EPA's progress in responding to this Court's summary judgment order, but the Court cannot agree. To begin with, plaintiffs' accusations of delay by EPA in this litigation are overstated. While it is true that EPA has not yet shown any signs of moving to repeal the challenged regulation, it is also true that there has been no final order in this case. Until this juncture, EPA did not know with certainty what the final remedy would be, nor has it been able to appeal or seek a stay of this Court's order pending appeal. Thus, the

United States District Court

For the Northern District of California

18

**United States District Court**
For the Northern District of California

1    Court finds no reason to presume that EPA needs active oversight from the Court.

2        More importantly, the Court finds that plaintiffs' proposed schedule would create a host of

3    practical problems that would run the risk of interfering with the agency's exercise of its authority. For

4    example, were the Court to adopt plaintiffs' proposed 90-day "check-in" from EPA, EPA might very

5    well feel pressure to choose a certain course in order to buy itself more time to wrestle with the

6    substantive issues it faces, or to mitigate the impact of its actions on agencies that issue NPDES permits.

7    The Court believes it desirable to avoid these results. It also trusts that EPA knows the magnitude of

8    the danger presented by invasive species. *See* Pl. Reply Br., Exh. A (congressional testimony of

9    Kathleen Moore). Accordingly, the Court believes EPA will act promptly, in accordance with

10    Congress's mandate, to address that danger.

11        For similar reasons, the Court rejects plaintiff-intervenors' proposed remedy of requiring that

12    interim controls be put in place immediately. Because EPA is altering a longstanding and established

13    regulation, the Court believes EPA must have the ability to exercise its expertise in an environment free

14    from unrealistically tight time constraints. Moreover, requiring EPA to take the specific step of enacting

15    interim controls would overly interfere with the operation of the agency's discretion.

16        Defendants argue against the imposition of any deadline, arguing that immediate action is

17    unnecessary and possibly counterproductive. Defendants also argue that imposing a tight deadline will

18    have an enormously burdensome effect on both the industry and the agencies that issue NPDES permits.

19    All these arguments, however, fly in the face of the overriding fact that the challenged regulation is *ultra*

20    *vires* to the CWA. The question is not, in the Court's view, a policy decision of how to eventually

21    regulate vessel discharges. Rather, the question is how, on a reasonably swift basis, Congress's express

22    mandate can be fulfilled. Rather than viewing the question as how much time the Court is taking away

23    from EPA's decision on how to act, the proper question is how much time is the Court placing in the

24    way of the fulfillment of Congress's goals.

25        EPA also argues that a deadline would be difficult to meet and may be counterproductive, due

26    to the fact that ballast water treatment technologies have not been fully developed. But this argument

27    ignores the flexibility inherent in the CWA. As discussed above, EPA must only apply the "best

28    available technology economically achievable"; it need not rush to develop new pollution control

United States District Court

For the Northern District of California

technologies.  In addition, the Court notes that EPA is not working with a blank slate.  In promulgating new regulations EPA will have before it substantial work that has been done by both the Coast Guard and by the IMO.  Indeed, it appears likely that the "best available technology" will include many of the measures that the Coast Guard has required through its regulations.  Thus, the Court believes that EPA has overstated its concerns over rushing to install new technologies that may turn out to be detrimental in unforeseen ways.

EPA's concerns about disruption to the shipping industry and the administrative permit system raise important points.  As spelled out in the defendants' briefs, the economic consequences of misguided regulation on the North American and global shipping industry could be enormous.  The Court is confident, however, that EPA has both the expertise and discretion to find an adequate solution to the problem at hand.  Moreover, EPA, the industry, and the regulatory agencies all have more than two years to prepare for any behavioral change that results from EPA's action.  The Court believes this is a sufficient amount of time to soften the suddenness of the regulatory change.

Importantly, while the Court is sensitive to the fact that the regulation at issue has existed for the past three decades, few of defendants' arguments about the practical difficulties that regulation of vessel discharges will cause are due to the longstanding nature of the regulation.  Rather, defendants' protestations are largely based on the difficulty of the regulation itself, and thus would have had to have been confronted 30 years ago had EPA acted according to its statutory mandate.  In such a circumstance, the Court does not believe that the fulfilment of Congress's intent should be unduly delayed.

**4.      The Shipping Coalition's Request for a Stay**

The Shipping Coalition argues that this Court should stay its remedy pending appeal.  Federal Rule of Civil Procedure 62(c) governs such requests, and provides:

> When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Fed. R. Civ. P. 62(c).  Thus, by the terms of the rule there must be a final judgment and an appeal before a stay may be granted.  Neither has yet occurred in this case.  In any event, given the significant time

1    period allocated to EPA to respond to this Court's order, the Court is doubtful that a stay is necessary.

2    Accordingly, Shipping Coalition's request pending appeal is DENIED without prejudice to raising the

3    issue again through properly noticed motion once final judgment has issued and an appeal has been

4    taken in this case.

5

6                                              **CONCLUSION**

7            For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiffs'

8    request for a permanent injunction (Docket No. 83) and REMANDS this matter to EPA for further

9    proceedings consistent with this Court's orders.  The blanket exemption for discharges incidental to the

10   normal operation of a vessel, contained in 40 C.F.R. § 122.3(a), shall be vacated as of September 30,

11   2008.

12

13           **IT IS SO ORDERED.**

14

15   Dated: September 18, 2006

                                                _____
16                                              SUSAN ILLSTON
                                                United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California